C53MREEC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

THERESA REEL,

                    Plaintiff,

             v.                          09 Civ. 7322 (PGG)

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                    Defendant.

------------------------------x
                                         New York, N.Y.
                                         May 3, 2012
                                         11:15 a.m.

Before:

                    HON. PAUL G. GARDEPHE,

                                         District Judge

                         APPEARANCES

CARY KANE
     Attorney for Plaintiff
BY:   JOSHUA PARKHURST

MICHAEL A. CARDOZO, Corporation Counsel
for the City of New York
     Attorney for Defendant
BY:   LAWRENCE PROFETA

C53MREEC

1          (Case called)

2          THE COURT:  As you both know, pending before me has

3     been defendant's motion for summary judgment, and I am going to

4     read my decision into the record.  It is going to take some

5     time.  I apologize for that.  But I am interested in moving the

6     case forward as quickly as possible and it's more efficient for

7     me to issue the ruling from the bench than to take the time to

8     enter a written opinion, so that's why I'm proceeding the way I

9     am.

10          Plaintiff Theresa Reel alleges that defendant New York

11    City Department of Education discriminated against her in

12    violation of Title VII of the Civil Rights Act of 1964, 42

13    U.S.C. Section 2000 et seq., Title IX of the Education

14    Amendments of 1972, 20 U.S.C. Section 1681 et seq., The New

15    York State Human Rights Law, New York Executive Law Section

16    296, and the New York City Human Rights Law, New York City

17    Administrative Code, Section 8-101 et seq.  Plaintiff brings

18    claims for hostile work environment and retaliation.

19          The Department of Education has moved for summary

20    judgment on all of plaintiff's claims.  In seeking summary

21    judgment DOE has submitted a Rule 56.1 statement listing 345

22    allegedly undisputed material facts.  Not surprisingly,

23    plaintiff disputes many of these allegedly undisputed material

24    facts and submits nearly 500 additional allegedly material

25    facts, many of which DOE disputes.  In short, this is a

C53MREEC

1    factually intensive case and one in which many facts are in

2    dispute.  Because there are material issues of fact, DOE's

3    motion for summary judgment on plaintiff's Title VII and Title

4    IX claims will be denied.  Plaintiff failed to submit a proper

5    notice of claim as to her New York State Human Rights Law and

6    New York City Human Rights Law claims, however, and, as a

7    result, DOE is entitled to summary judgment on those claims.

8    Accordingly, DOE's motion for summary judgment will be granted

9    in part and denied in part.

10           Plaintiff has worked as a high school teacher at the

11   School for Legal Studies in Brooklyn, New York since September

12   of 2005, citing defendant's Rule 56.1 statement, paragraph 1.

13   I will refer to the school throughout this opinion as SLS.

14   Plaintiff has offered evidence that throughout her tenure at

15   SLS, numerous students have made derogatory and degrading

16   remarks of a sexual nature to her on a regular basis.  For

17   example, there is evidence that on at least 14 occasions

18   between June 2007 and September 2010, students yelled "suck my

19   dick" or "Ms. Reel sucks dick" at her, citing defendant's Rule

20   56.1 statement at paragraphs 85, 91, 182, 196, 227, 245, 247,

21   250, and 342-343.  Also, the Parkhurst declaration, Exhibit 4,

22   and plaintiff's Rule 56.1 response at paragraphs 492, 575, 607,

23   and 611.  There is evidence in the record that on numerous

24   occasions students speaking to Ms. Reel made reference to her

25   genitals and other body parts.  Id. paragraphs 48-49, 53-55,

C53MREEC

1  77-79, 117, 232; plaintiff's Rule 56.1 response, paragraphs

2  232, 419, and 579.

3          Ms. Reel has offered evidence that on one occasion a

4  student called her an "ugly bitch" and stated, "I have rubbers,

5  want to party?"  Id., paragraph 130.  On another occasion, a

6  student told the class that another student who had received a

7  high mark on an assignment must have performed oral sex on Reel

8  in exchange for the grade.  Id., paragraph 145.  There is also

9  evidence that Reel was subjected to frequent sex-based name

10  calling, including being referred to as a "bitch," a "cunt," a

11  "ball licker," and "cock sucker."  Id., paragraphs 33, 61,

12  72-74, 91, 97, 130, 227, and 238; Parkhurst declaration,

13  Exhibit 4; plaintiff's Rule 56.1 response at paragraph 535.  In

14  addition to the misogynistic and sexually-oriented comments by

15  students, there is also evidence that Reel has been subjected

16  to obscene gestures by students, and that on at least one

17  occasion inappropriate sexual contact by a student.  Id.

18  paragraph 64-67, 142 and 245.

19          It is undisputed that Ms. Reel complained repeatedly

20  about this conduct to SLS administrators, including various

21  assistant principals, principals, and deans of the school.

22  See, for example, defendant's Rule 56.1 statement, paragraphs

23  48, 69, 113, 133-34, 240, 261, 271.  DOE asserts that these

24  administrators "acted reasonably and promptly in response to

25  plaintiff's complaints about her students," and that the

C53MREEC

1    "multidisciplinary approach taken by the school to student

2    misconduct, which included removal from the classroom,

3    conferences with a student, his or her parent/guardians, and,

4    in some cases, suspensions, was certainly reasonable," citing

5    defendant's brief at 14 and 16.  I conclude, however, that

6    there are material issues of fact as to whether the steps taken

7    by SLS administrators were adequate, particularly with respect

8    to general deterrence, as Ms. Reel has presented evidence that

9    the sexual harassment by students continued unabated.

10          Ms. Reel has also offered evidence that SLS

11   administrators retaliated against her for engaging in protected

12   activity, which included the filing of internal complaints

13   about sexual harassment by her students, filing charges of

14   discrimination with the EEOC, and commencing this action.

15          The alleged retaliation includes negative classroom

16   evaluation reports and an unsatisfactory rating for the

17   2009-2010 school year.  DOE argues that Ms. Reel cannot

18   demonstrate causation because "there is no evidence of

19   retaliatory animus," "nor is any alleged retaliatory action

20   close in time to when plaintiff engaged in protected activity,"

21   Citing defendant's brief at 20.  DOE further contends that even

22   if Ms. Reel could establish a prima facie case of retaliation,

23   she cannot demonstrate pretext.

24          Ms. Reel filed a charge of discrimination with the

25   EEOC on or about August 1, 2008, and the EEOC issued her a

C53MREEC

right to sue letter on May 28, 2009, citing defendant's Rule

56.1 statement, paragraphs 9 through 10.  She filed the instant

action on August 20, 2009.

       With respect to the legal standard for summary

judgment, summary judgment is warranted where the moving party

shows that "there is no genuine issue as to any material fact"

and that it "is entitled to judgment as a matter of law,"

Citing Federal Rule of Civil Procedure 56(c).  "A dispute about

a genuine issue exists for summary judgment purposes when the

evidence is such that a reasonable jury could decide in the

nonmovant's favor," citing Beyer v. County of Nassau, 524 F.3d

160, 163 (2d Cir. 2008).  In deciding a summary judgment

motion, the Court "resolves all ambiguities and credits all

factual inferences that could rationally be drawn in favor of

the party opposing summary judgment," citing Cifra v. General

Electric Company, 252 F.3d 205, 216 (2d Cir. 2001).

       "It is now beyond cavil that summary judgment may be

appropriate even in the fact-intensive context of

discrimination cases," and that "the salutary purposes of

summary judgment avoiding protracted, expensive, and harassing

trials apply no less to discrimination cases than to other

areas of litigation," citing Abdu-Brisson v. Delta Airlines,

Inc., 239 F.3d 456, 466 (2d Cir. 2001).  As in any other case,

"an employment discrimination plaintiff faced with a properly

supported summary judgment motion must do more than simply show

C53MREEC

1    that there is some metaphysical doubt as to the material facts.

2    She must come forth with evidence sufficient to allow a

3    reasonable jury to find in her favor," citing Brown v.

4    Henderson, 257 F.3d 246, 252 (2d Cir. 2001).

5         "Mere conclusory statements, conjecture or

6    speculation" by the plaintiff will not defeat a summary

7    judgment motion.  Gross v. National Broadcasting Company, Inc.,

8    232 F.Supp.2d 58, 67 (S.D.N.Y. 2002).  Instead, the plaintiff

9    must offer "concrete particulars."  Bickerstaff v. Vassar

10   College, 196 F.3d 435, 451-52 (2d Cir. 1999).

11        In the context of a hostile work environment claim,

12   however, "the promptness and adequacy of an employer's response

13   is generally a question of fact for the jury," citing Hussain

14   v. Long Island Railroad Company, 2002 WL 31108195, at *8

15   (S.D.N.Y. September 20, 2002); Rooney v. Capital District

16   Transportation Authority, 109 F.Supp.2d 86, 95. (N.D.N.Y. 2000)

17   ("The assessment of the employer's response to the

18   inappropriate conduct [causing a hostile work environment] is

19   frequently considered a jury question.  Indeed, if the evidence

20   creates an issue of fact as to whether an employer's action is

21   effectively remedial and prompt, summary judgment is

22   inappropriate.")

23        Similarly, "in cases based on allegations of

24   discriminatory retaliation, courts must use an extra measure of

25   caution in determining whether to grant summary judgment

C53MREEC

1    because direct evidence of discriminatory intent is rare and

2    such intent often must be inferred from circumstantial

3    evidence," citing Thompson v. Morris Heights Health Center,

4    2012 WL 1145964, at *4 (S.D.N.Y. 2012); see also Ukeje v. New

5    York City Health and Hospital Corporation, 2011 U.S. Dist.

6    LEXIS 127826, at *13 (S.D.N.Y. November 4, 2011) ("When a case

7    turns on the intent of one party, as employment discrimination

8    and retaliation claims often do, a trial court must be cautious

9    about granting summary judgment.  Because the employer rarely

10   leaves direct evidence of its discriminatory or retaliatory

11   intent, the Court must carefully comb the available evidence in

12   search of circumstantial evidence to undercut the employer's

13   explanations for its actions").  Batyreva v. New York City

14   Department of Education, 2010 WL 3860401, at *11 (S.D.N.Y.

15   October 1, 2010) ("Due to the highly fact-specific nature of

16   the inquiry, an extra measure of caution is needed in awarding

17   summary judgment to a defendant where, as in a discrimination

18   or retaliation case, intent is at issue.").

19        In considering plaintiff's claims under Title VII and

20   Title IX, I apply the same analytical framework and standards.

21   See AB v. Rhinebeck Central School District, 224, F.R.D. 144,

22   153 (S.D.N.Y. 2004).

23        As to the hostile work environment claim, as a

24   threshold matter, I note that Ms. Reel may sustain a hostile

25   work environment claim against DOE based on the activities of

C53MREEC

1    SLS students and the administration's response to her

2    complaints about those activities.  She may prevail on such a

3    claim by showing "first, that a hostile environment existed

4    and, second, that the school board either provided no

5    reasonable avenue of complaint or knew of the harassment and

6    failed to take appropriate remedial action," citing Peries v.

7    New York City Board of Education, 2001 U.S. Dist. LEXIS, 23393,

8    at *19 (E.D.N.Y., August 6, 2001); see also Andersen v.

9    Rochester City School District, 2011 WL 1458068, at *4

10   (W.D.N.Y. April 15, 2011) ("Plaintiff may prevail on her

11   hostile work environment claim for conduct of the [student] and

12   her coworkers if she can demonstrate, one, that a hostile

13   environment existed and, two, that there was no reasonable

14   avenue for complaint or the district knew of the harassment and

15   did nothing about it."); Berger-Rothberg v. City of New York,

16   803 F.Supp.2d 155 at 164-65 (E.D.N.Y. 2011) (same).

17        DOE argues that Peries and its progeny were wrongly

18   decided, citing defense brief at 9.  While the Second Circuit

19   has not addressed the issue of student-on-teacher harassment,

20   see Das v. Consolidated School District of New Britain, 369,

21   Fed. Appx. 186, 190 (2d Cir. 2010).  DOE has cited no case

22   running contrary to Peries.  Indeed, courts have uniformly held

23   that liability for hostile work environment may be premised on

24   student-on-teacher harassment.  See, e.g., Schroeder v.

25   Hamilton School District, 282 F.3d 946, 951 (7th Cir. 2002)

C53MREEC

1   (explaining that in the Title VII context, school district

2   could be liable to a teacher if they "they knew he was being

3   harassed and failed to take reasonable measures to try to

4   prevent it."); Berger-Rothberg, 803 F.Supp.2d at 164-65;

5   Andersen, 2011 WL 1458068, at *4; Mongelli v. Red Clay

6   Consolidated School District Board of Education, 491 F.Supp.2d,

7   467, 478 (D. Del. 2007) (holding that "liability for hostile

8   work environment claims under Title VII may attach to schools

9   that fail to address teachers' claim of harassment by

10   students"); Plaza-Torres v. Rey, 376 F.Supp.2d 171, 182 (D.P.R.

11   2005) ("we will not limit the reach of Title VII liability by

12   closing the door on student-on-teacher harassment.").  I find

13   the reasoning in Peries and its progeny persuasive and it will

14   be applied here.

15       "To establish the existence of a hostile work

16   environment in connection with a sexual harassment claim under

17   Title VII, plaintiffs must show (1) that she is a member of a

18   protected group; (2) that she was subjected to unwelcome

19   conduct; (3) that the conduct was based on her sex; and (4)

20   that the conduct was sufficiently severe or pervasive to alter

21   the conditions of her employment," citing Fosen v. The New York

22   Times, 2006 WL 2927611, at *8 (S.D.N.Y. October 11, 2006).

23   Evaluating a hostile work environment claim involves reviewing

24   the totality of the circumstances, including "the frequency of

25   the discriminatory conduct; its severity; whether it is

C53MREEC

physically threatening or humiliating, or a mere offensive
utterance; and whether it unreasonably interferes with an
employee's work performance," citing Harris v. Forklift
Systems, Inc., 510 U.S. 17, 23 (1993).  A single instance of
harassment is typically insufficient to establish a hostile
work environment, citing Cruz, 202.3d at 570.  However, a
single incident of harassment may give rise to a hostile work
environment claim if that incident is extraordinarily severe.
Id.

     A plaintiff making a hostile work environment claim
must show "not only that she subjectively perceived the
environment to be abusive, but also that the environment was
objectively hostile and abusive," citing Benn v. City of New
York, 2011 WL 839495, at *9 (E.D.N.Y. March 4, 2011).  Finally,
"the plaintiff must show a specific basis for imputing the
conduct creating the hostile work environment to the employer,"
citing Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004).

     Here, Ms. Reel has offered sufficient evidence on each
element of her hostile work environment claims to permit them
to go to a jury.  Viewing the evidence in the light most
favorable to Ms. Reel, a rational jury could conclude that the
student sexual harassment was sufficiently severe and pervasive
to create a hostile work environment.  As I have discussed, Ms.
Reel has offered evidence that she was the victim of ongoing
vicious name calling, sexual innuendos, sexual overtures, and,

C53MREEC

at least in one case, inappropriate sexual contact.  A rational

jury could find that these events "were sufficiently continuous

and concerted to have altered the conditions of her working

environment," citing Peries, 2001 U.S. Dist. LEXIS 23393, at

*19.  There is evidence that students made vulgar references to

Ms. Reel's genitals and other body parts, propositioned her for

sex, simulated sex acts in front of her, referred to her using

gender-based epithets, and that one student rubbed up against

her breast.  The offensive conduct about which Ms. Reel

complains is similar to conduct that other courts have found

sufficient to demonstrate a hostile work environment.  See,

e.g., Torres v. Pisano, 116 F.3d 625, 632-33 (2d Cir. 1997) ("A

reasonable woman would find her working conditions altered and

abusive when her supervisor repeatedly referred to her as a

dumb cunt, suggested that she was in the habit of performing

oral sex for money, ridiculed her pregnancy, commented on her

anatomy and his desire to have sex with her, and allowed

friends of his who visited him at the office to make crude

sexual remarks about her.  Plaintiff has therefore established

a strong prima facie case of sexual harassment."); Kotcher v.

Rosa & Sullivan Appliance Center, Inc., 957 F.2d 59, 61-63 (2d

Cir. 1992) (affirming district court's finding that plaintiff

has been subjected to a hostile work environment in which

plaintiff's supervisor has repeatedly subjected them to vulgar

comments and gestures); Dyke v. McCleave, 79 F.Supp.2d 98, 105

C53MREEC

1    (N.D.N.Y. 2000) (finding sufficient evidence of hostile work

2    environment where plaintiff's supervisor "repeatedly used

3    profanity in his communications with plaintiff and, on a daily

4    basis, referred to her and other female employees as cunt,

5    slut, whore, lesbian, dyke, and other similar derogatory

6    names"); Badlam v. Reynolds Metals Company, 46 F.Supp.2d. 187

7    195 (N.D.N.Y. 1999) (finding sufficient evidence of hostile

8    work environment where plaintiffs offered "evidence that they

9    were repeatedly subjected to sexual innuendo, rude and

10   offensive comments, pornographic materials, and explicit,

11   tasteless drawings and written profanity by their male

12   coworkers.  Hollis v. City of Buffalo, 28 F.Supp.2d, 812,

13   820-21 (W.D.N.Y. 1998) (finding hostile work environment where

14   plaintiff offered evidence that her supervisor "engaged in

15   offensive sexual harassment that included commenting about her

16   breasts, making obscene gestures directed at her, repeatedly

17   using vulgar and offensive language when speaking to her or

18   others in her presence, and leaving inappropriate messages over

19   her work pager.").  Although DOE dismisses several of these

20   incidents as "simple teasing or offhand comments," a reasonable

21   fact finder could conclude that many of the incidents went far

22   beyond teasing and constituted severe and pervasive sexual

23   harassment sufficient to have altered Ms. Reel's work

24   environment.

25        It is likewise clear that Ms. Reel perceived the

C53MREEC

1   environment to be hostile.  She repeatedly submitted complaints

2   about the sexual harassment, and she has testified that she

3   sought mental health counseling because she felt suicidal due

4   to "the situation at work," Reel deposition, 31 and 40.

5   Indeed, Ms. Reel states in her declaration that she attempted

6   suicide on May 4, 2011 as a result of the alleged harassment,

7   Reel declaration, paragraph 65.

8        DOE contends that "there is no evidence that the

9   incidents plaintiff complains about in this lawsuit occurred as

10  a result of her gender.  In fact, the evidence is to the

11  contrary," citing defense brief at 2.  I disagree.  There is

12  evidence that certain harassment was directed only at female

13  teachers.  Mary Kate Schweizer, another teacher at SLS, has

14  submitted a declaration stating that the conduct about which

15  Reel complains is "reserved for female teachers, not male

16  teachers," citing Schweizer declaration at paragraph 8.

17  Moreover, many of the terms used to refer to Ms. Reel, such as

18  "bitch," "cunt," "ball licker," and "cock sucker" are usually

19  associated with females.  See, e.g, Windsor v. Hinckley Dodge,

20  Inc., 79 F.3d 996, 1000 (10th Cir. 1996) ("The names plaintiff

21  was called, both verbally and in the form of notes, were also

22  sexual in nature.  Over the course of her employment, plaintiff

23  was called a "whore," "cunt," and "bitch" on a consistent

24  basis.  These sexual epithets have been identified as

25  "intensely degrading to women.") Braunstein v. Barber, 2009 WL

C53MREEC

849589, at *6 (S.D.N.Y. March 30, 2009) ("Using the term bitch

can be construed as sex-based harassment."); Funk v. F&K

Supply, Inc., 43 F.Supp.2d 205, 216-17 (N.D.N.Y. 1999) (finding

hostile work environment where plaintiff's supervisor, among

other things, called her "cunt" and "bitch" and frequently said

to her, "you blow me").  Although courts "must be careful not

to make broad generalizations or assumptions based on the mere

use of words" that have some gender-based connotation, such as

"bitch" and should consider whether words were used "because of

plaintiff's gender or for some other reason," citing Petenaude

v. Salmon River Central School District, 2005 WL 6152380, at *5

(N.D.N.Y. February 16, 2005), here a rational jury could

conclude that the students' repeated use of the word "bitch"

and other terms with gender-based connotations to refer to Reel

is evidence of gender-based animus and that Reel would not have

been subjected to the harassment but for her sex.

     "Ultimately, the jury will have to make a decision by

looking at all the circumstances surrounding the harassment,

including the severity of the abuse, the nature of the

humiliation, its interference with Ms. Reel's teaching, and its

effect on her psychological well-being," citing Peries, 2001 WL

1328921, at *6.

     The Court likewise cannot resolve as a matter of law

the second element of Reel's hostile work environment claims,

whether DOE either provided no reasonable avenue of complaint

C53MREEC

1    or knew of the harassment and failed to take appropriate

2    remedial action.  There is no dispute here that DOE was aware

3    of the harassment.  Ms. Reel filed numerous complaints about

4    student sexual harassment.  She argues both that DOE failed to

5    provide a reasonable avenue for complaint and that it "has no

6    complaint process for sexual harassment of faculty by

7    students," and that DOE's disciplinary responses "were

8    inconsistent and ineffective," citing the plaintiff's

9    opposition brief at 13 and 15.

10            Courts have cautioned that "the question of whether

11   school officials took appropriate remedial action is a question

12   of fact, not law.  The jury's analysis of this question can

13   include such issues as what disciplinary options are available

14   short of suspension and what constitutes a proper division of

15   disciplinary responsibility between administrators and

16   teachers" citing Peries, 2001 U.S. Dist. LEXIS, 23393, at *21;

17   see also Reed v. A.W. Lawrence & Company, Inc., 95 F.3d 1170,

18   1181 ("the question of whether an employer has provided a

19   reasonable avenue of complaint is a question for the jury.");

20   Dobrich v. General Dynamics Corp. Electric Boat Division, 106

21   F.Supp.2d 386, 394 (D. Conn. 2000) ("Although there was

22   evidence that defendant responded to plaintiff's complaints,

23   the critical issue was whether its response was adequate.

24   Plaintiff claims that the pattern of ineffectual action

25   continued throughout the course of her employment.  The

C53MREEC

1    promptness and adequacy of an employer's response is generally

2    a question of fact for the jury."

3            Here, DOE argues that SLS administrators promptly

4    responded to plaintiff's complaints and that "almost without

5    exception plaintiff did not suffer any repeated episodes of

6    sexual harassment by any of the students about whom she

7    complained," citing the defendant's brief at 14-15.

8            The record contains evidence that certain of Reel's

9    students continued to harass her even after she had complained,

10   however, and even after discipline had allegedly been imposed.

11   For example, on or about February 4, 2008, Ms. Reel submitted a

12   complaint concerning students TP and TH, citing defendant's

13   Rule 56.1 statement at paragraph 152.  According to the

14   complaint, TP told the class that an object on Ms. Reel's desk

15   was a "sex toy," Id.  TH then loudly whispered "sex toy," and

16   pointed to his spread legs Id.  In May 2008, Ms. Reel filed

17   another complaint against TH, who stared and her chest during

18   class, Id. at paragraph 163.  Similarly, on October 25, 2005,

19   student SB stated, among other things, that Reel "ain't got a

20   man," Id. at paragraph 40.  On or about November 8, 2007, that

21   same student yelled out in class that Reel was a "lesbian," Id.

22   at paragraph 112.  On January 17, 2007, Ms. Reel filed a

23   complaint concerning CA, alleging that she had called Ms. Reel

24   "tits" in the hallway, Parkhurst declaration, Exhibit 4.  On or

25   about June 13, 2008, Ms. Reel submitted a complaint concerning

C53MREEC

the same student, alleging that she yelled "bitch," "fuck you,"
"pussy bitch," and "suck my dick" at Ms. Reel, <u>Id.</u>  On June 24,
2008, Ms. Reel filed a third complaint against CA, alleging
that she yelled in public "Ms. Reel sucks dick," <u>Id.</u>

        In late April 2009, Ms. Reel submitted a complaint
concerning student JC, who allegedly yelled "bitch" at Ms. Reel
and told her to "suck him off," defendant's Rule 56.1
statement, paragraph 238.  On April 28, 2009, Ms. Reel
submitted another complaint concerning JC, alleging that he
yelled outside the door to her classroom "Ms. Reel sucks man
dick" and grabbed his crotch and simulated masturbation while
telling Reel to "suck his dick," <u>Id.</u> at paragraph 245.

        In sum, there is evidence that some of the same
students repeatedly made sexually-oriented misogynistic
comments to Ms. Reel even after she had complained about their
conduct and they had allegedly been disciplined.

        There is also evidence that often there was no
practical mechanism for Ms. Reel and other female teachers to
have their complaints about sexual harassment addressed.  For
example, Ms. Reel testified that Dean Villa-Leffler would "roll
her eyes and nothing would get done" when Ms. Reel submitted
complaints about student sexual harassment to her, citing Reel
deposition at 43.  Ms. Reel also testified that Dean
Villa-Leffler often asserted that she had contacted a parent
about a student's misconduct, but there was no evidence that

C53MREEC

1    she had actually spoken to the parent, Reel deposition at 278.

2            Ms. Schweizer states in her declaration that "in my

3    experience at the School for Legal Studies, no action is taken

4    against students [for sexual harassment] and the administration

5    has chosen to accept such behavior as standard conduct from

6    students," citing the Schweizer declaration, paragraph 8.

7            Ms. Reel also testified that although all teachers

8    have classroom phones that they can use to call the Dean's

9    office if a student is engaging in a threatening behavior,

10   citing defendant's Rule 56.1 statement at paragraph 19.  When

11   she has used the phone to call the Dean's office, "no one has

12   ever picked up," Reel deposition at 94, plaintiff's Rule 56.1

13   statement, paragraph 19.

14           There is also evidence that since Principal Monica

15   Ortiz arrived at SLS, teachers no longer have the ability to

16   send a disruptive student out of the classroom unilaterally,

17   citing Reel deposition at 88-89.  According to Ms. Reel, prior

18   to the arrival of Principal Ortiz, teachers could unilaterally

19   send disruptive students to a designated "save" room.  While

20   DOE asserts that the save room still exists and is located in

21   the principal's office or the back of the Dean's office, citing

22   defendant's Rule 56.1 statement, paragraph 30, and Ortiz

23   deposition, 35-38, Ms. Kleinfeld testified that SLS does not

24   "have a save room and generally does not have people to staff

25   the save room, so our principal believes that the save room is

C53MREEC

1   in the Dean's office, but the problem with this is that when

2   there is no one in the Dean's office, what do you do with the

3   children who are in save," citing Kleinfeld deposition at 41.

4            There are also material issues of fact as to whether

5   DOE acted in a timely fashion in responding to Ms. Reel's

6   complaints and whether those complaints were thoroughly

7   investigated.  For example, Ms. Reel testified that a lengthy

8   period of time passed between her complaint about an incident

9   in which a student touched her breast and Dean Abreu's

10  investigation of that complaint, citing the Reel deposition at

11  142-43.  Ms. Reel also testified that Dean Abreu discouraged

12  her from pressing the complaint, stating that DOE's

13  "investigators are trained to zero in on our teachers instead

14  of students," Id. at 143.  Although Ms. Schweizer submitted a

15  witness statement in connection with the breast-touching

16  incident, she was never questioned by any SLS administrators,

17  Schweizer declaration, paragraphs 4-5.  Ms. Schweizer also

18  states in her declaration that although she complained about an

19  incident in which a student hugged her twice after she asked

20  him not to touch her, she was "never contacted by anyone at the

21  School for Legal Studies to investigate the incident.  The only

22  response by the school was for Assistant Principal McCoy to

23  bring [the student's] mother by my class when I was teaching to

24  say that she (not her son) was sorry," Schweizer declaration,

25  paragraph 7.

C53MREEC

1            Finally, given Reel's testimony that the vicious

2    name-calling and sexual innuendo never ended, a rational jury

3    could conclude that SLS's actions were plainly ineffective.

4    Courts have held that a failure to take measures to prevent

5    harassment creates a genuine issue of material fact as to

6    whether an employer's response to harassment was reasonable.

7    See Abdullah v. Panko Electric & Maintenance, Inc., 2011 U.S.

8    Dist. LEXIS 29663, at *49 (N.D.N.Y., March 23, 2011) ("Based on

9    management's response, or lack thereof, to instances of

10   harassment of which they were made aware, a genuine issue of

11   material fact exists regarding whether the procedures set up by

12   the employer to prevent further harassment were reasonable

13   and/or whether the remedial actions taken by the employer in

14   response to plaintiff's complaint were reasonable").

15           Accordingly, DOE's motion for summary judgment on

16   plaintiff's hostile work environment claims under Title VII and

17   Title IX will be denied.

18           As to retaliation, "Title VII's antiretaliation

19   provision prohibits an employer from discriminating against an

20   employee or job applicant because she has opposed a practice

21   that Title VII forbids or has made a charge, testified,

22   assisted or participated in a Title VII investigation,

23   proceeding or hearing," citing Berger-Rothberg, 803 F.Supp.2d

24   at 165.  Courts evaluate Title VII retaliation claims using a

25   three-step burden-shifting analysis.  "First, the plaintiff

C53MREEC

 1    must establish a prima facie case of retaliation.  If the

 2    plaintiff succeeds, then a presumption of retaliation arises

 3    and the employer must articulate a legitimate, nonretaliatory

 4    reason for the action that the plaintiff alleges was

 5    retaliatory.  If the employer succeeds at the second stage,

 6    then the presumption of retaliation dissipates and the

 7    plaintiff must show that retaliation was a substantial reason

 8    for the complained-of action." Fincher v. Depository Trust &

 9    Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010).

10          To establish a prima facie case of retaliation, "a

11    plaintiff must show that (1) she participated in a protected

12    activity; (2) the defendant knew of the activity; (3) an

13    adverse employment action took place; and (4) there exists a

14    causal connection between the protected activity and the

15    adverse employment action." Berger-Rothberg, 803 F.Supp.2d at

16    165.  Plaintiff's burden in this regard has been characterized

17    as "minimal and de minimus," Woodman v. WWOR-TV, 411 F.3d 69,

18    76,(2d Cir. 2005).  The Second Circuit has noted that "there

19    are no bright-line rules with respect to what constitutes an

20    adverse employment action for purposes of a retaliation claim,

21    and, therefore, courts must pore over each case to determine

22    whether the challenged employment action reaches the level of

23    the adverse," Fincher, 604 F.3d at 721.  After the Supreme

24    Court's decision in Burlington Northern and Santa Fe Railway

25    Company v. White, 548 U.S. 53, 2006, "a plaintiff must show

C53MREEC

 1   that a reasonable employee would have found the challenged

 2   action materially adverse, which in this context means it well

 3   might have dissuaded a reasonable worker from making or

 4   supporting a charge of discrimination," Id. at 68.  The Supreme

 5   Court noted in White that a plaintiff must show nontrivial

 6   action:  "We speak of material adversity because we believe it

 7   is important to separate significant from trivial harms.  An

 8   employee's decision to report discriminatory behavior cannot

 9   immunize that employee from those petty slights or minor

10   annoyances that often take place at work and that all employees

11   experience," Id.

12        A plaintiff may show retaliatory intent with direct

13   evidence "of retaliatory animus directed against plaintiff," or

14   with circumstantial evidence, including evidence that "the

15   protected activity was followed closely by discriminatory

16   treatment" or evidence of "disparate treatment of fellow

17   employees who engaged in similar conduct."  Raniola v. Bratton,

18   243 F.3d 610, 625 (2d Cir. 2001).

19        Here DOE concedes both that Ms. Reel engaged in

20   protected activity and that it knew of the protected activity,

21   citing defendant's brief at 16.  Accordingly, the first and

22   second elements of a prima facie case are present.

23        With respect to adverse employment action, Ms. Reel

24   points to, among other things, the following:  (1) negative

25   classroom evaluations from June 2009, November 2009, January

C53MREEC

1   2010, and June 2010; (2) written and verbal admonishments by

2   SLS administrators; (3) allegedly excessive scrutiny by SLS

3   administrators, including required weekly meetings with

4   Assistant Principal Carla Heckstall and Principal Ortiz, and

5   the requirement that Reel complete additional paperwork

6   concerning lesson plans and complaints about students; and (4)

7   an unsatisfactory rating for the 2009-2010 school year, citing

8   plaintiff's opposition brief 23-25.

9          Because DOE concedes that Ms. Reel's unsatisfactory

10  rating for the 2009-2010 school year constitutes an adverse

11  employment action, see defendant's brief at 17, defendant's

12  reply brief at 10, I will address only that alleged adverse

13  employment action.

14         In order to establish a prima facie case of

15  retaliation, Ms. Reel must also offer evidence from which a

16  jury could infer a causal connection between the alleged

17  adverse employment action and her protected activity.

18         "Plaintiff may establish a causal connection directly

19  through proof of retaliatory animus, or indirectly, through

20  circumstantial evidence that, for example, the adverse action

21  followed close on the heels of the protected activity, or that

22  the employer also took adverse action against other employees

23  who engaged in protected activity.  Vo v. Goodwill Industries

24  of Bronx Site, 2009 WL 5179136, at *9 (S.D.N.Y. September 29,

25  2009) see also Sulehria v. City of New York, 670 F.Supp.2d 288,

C53MREEC

1   307 (S.D.N.Y. 2009).

2           DOE argues that Reel's unsatisfactory rating for the

3   2009-2010 school year was issued in June 2010, more than two

4   years after her first complaint in February 2008 to the DOE's

5   Equal Employment Opportunity office, citing defendant's brief

6   at 20.  However, that complaint is not the only protected

7   activity Ms. Reel engaged in, and some of the protected

8   activity is sufficiently close in time to the unsatisfactory

9   rating to demonstrate causation for purposes of establishing a

10  prima facie case of retaliation.

11          The Second Circuit has ruled that internal complaints

12  qualify as activities protected from retaliation by Title VII.

13  See Raniola, 243 F.3d at 625 ("The district court failed to

14  consider evidence of plaintiff's other protected activities.

15  Raniola's 1987 EEOC complaint and May 1995 internal police

16  complaint also qualify as protected activities from retaliation

17  by Title VII.")  Here, Reel made numerous internal complaints

18  concerning sexual harassment by students in proximity to her

19  June 2010 unsatisfactory rating.  See Johnson v. Nicholson,

20  2007 WL 1395546, at *7 (E.D.N.Y., May 11, 2007) ("Plaintiff's

21  protected activity was continuous and ongoing for several

22  years.  For this reason, defendant's adverse employment actions

23  could have taken place simultaneously to any one of plaintiff's

24  complaints.  A reasonable jury could find that the actions were

25  temporally related to these complaints.").  For example, on or

C53MREEC

about March 19, 2010, approximately nine days before the June

2010 unsatisfactory rating, Ms. Reel submitted a complaint

about a student who had left a sexually-charged note on her

desk, defendant's Rule 56.1 statement at paragraph 262.

          In addition to temporal proximity, Ms. Reel has

offered some evidence of retaliatory animus.  She testified

that Principal Ortiz became upset with her when she reported

students' sexual harassment, and that Dean Villa-Leffler rolled

her eyes when Ms. Reel submitted complaints about students'

misconduct, citing Reel deposition, 40 to 43.  In her

declaration, Ms. Reel states that she attempted to submit a

student complaint to Dean Villa-Leffler about an incident that

occurred on or about September 22, 2008, but that the Dean

refused to accept her complaint, reel declaration, paragraph

31.  Reel also testified that Assistant Principal Heckstall

told her "you'd better watch out, she is out to get you,"

referring to Principal Morgan, citing Reel deposition, 252-53.

Ms. Schweizer testified that Dean Villa-Leffler urged her not

to report incidents of sexual harassment, telling her not to

"make things hot for yourself" and "you don't want to end up in

trouble," Schweizer declaration, paragraph 9.  Schweizer also

states that Dean Villa-Leffler informed her that Principal

Ortiz was angry with her because her name came up in connection

with this lawsuit and that she advised her to "stay off the

radar," Schweizer declaration, paragraph 15.

C53MREEC

1      I find that Ms. Reel has satisfied her minimal burden

2  at the prima facie stage in demonstrating causation.

3      "Once a plaintiff has made out a prima facie case, the

4  burden of production shifts to the defendant to articulate a

5  legitimate, nondiscriminatory basis for the alleged retaliatory

6  acts."  <u>Johnson</u>, 2007 WL 1395546, at *7.  "This burden of

7  production is not very demanding."  <u>Id.</u>  Here, DOE has offered

8  a legitimate nondiscriminatory basis for the unsatisfactory

9  rating Ms. Reel received for the 2009-2010 school year.  DOE

10 asserts that Ms. Reel's job performance was poor during that

11 year and points to contemporaneous documentary evidence in the

12 form of classroom observations in support of its claim.

13 Because DOE has articulated a nondiscriminatory reason for

14 Reel's unsatisfactory rating, it has met its burden of

15 production under the McDonnell-Douglas test.

16     "Once a defendant has met the burden of articulating a

17 legitimate, nonretaliatory reason for the challenged employment

18 decision, the plaintiff must point to evidence that would be

19 sufficient to permit a rational fact finder to conclude that

20 the employer's explanation is merely a pretext for

21 impermissible retaliation,"  <u>Johnson</u>, 2007 WL 1395546, at *8.

22 "To do this, plaintiff is obligated to produce not simply some

23 evidence, but sufficient evidence to support a rational finding

24 that the legitimate, nondiscriminatory reasons proffered by the

25 employer were false, and that more likely than not retaliation

C53MREEC

1   for complaints of discrimination was the real reason for the

2   adverse employment action," Id.

3          "Title VII is violated if a retaliatory motive played

4   a part in the adverse employment actions, even if it was not

5   the sole cause, and if the employer was motivated by

6   retaliatory animus, Title VII is violated, even if there were

7   objectively valid grounds for [the adverse employment action]."

8   Pergament v. Federal Express Corp., 2007 WL 1016993, at *14,

9   (E.D.N.Y. March 30, 2007).

10         Viewing the evidence in the light most favorable to

11   Reel, as I must, I find that she has produced sufficient

12   evidence from which a reasonable jury could find that DOE's

13   reasons for giving her an unsatisfactory rating for the

14   2009-2010 school year were based in part on a retaliatory

15   motive.  Over the four years that preceded the 2009-2010 school

16   year, Ms. Reel had received only satisfactory ratings,

17   plaintiff's Rule 56.1 response, paragraph 750-52.

18         Moreover, Ms. Reel consistently received praise from

19   Assistant Principal Heckstall prior to the 2009-2010 school

20   year.  Id. paragraph 755-56, 759-60, 762-64, 766.  Although

21   "prior good evaluations alone cannot establish that later

22   unsatisfactory evaluations are pretextual," Shabat v. Blue

23   Cross Blue Shield of Rochester Area, 925 F.Supp. 977, 988

24   (W.D.N.Y. 1996), the Second Circuit has recognized that such

25   evidence "may nonetheless work with other submitted proofs,

C53MREEC

such as biased remarks, to support a jury verdict of

discrimination."  <u>Danzer v. Norden Systems, Inc.</u>, 151 F.3d 50

at 56-57 (2d Cir. 1998); <u>see also</u> <u>Sklaver v. Casso-Solar Corp.</u>,

2004 WL 1381264, at *8 (S.D.N.Y., May 15, 2004) ("When a

defendant claims that it took adverse employment action against

plaintiff because of poor job performance, evidence of

previously good job performance may be used to show that the

claimed nondiscriminatory reason is nonpretextual.").

          Here, there is more than simply the unsatisfactory

rating.  A jury could find that (1) SLS administrators greeted

Reel's repeated complaints about sexual harassment with

hostility and exasperation; (2) an assistant principal warned

Reel that the principal was "out to get her"; and (3)

Schweizer, who supported Reel's complaints, was allegedly

warned by the school's Dean not to report incidents of sexual

harassment, and told that doing so would result in her getting

into trouble.  <u>See</u> <u>Martinez v. New York City Department of</u>

<u>Education</u>, 2008 WL at 2220638, at *13 (S.D.N.Y. May 27, 2008)

(citing "evidence of retaliation against other employees

engaged in protected activities" as one example of the evidence

that shows pretext).

          There is also evidence that Principal Ortiz failed to

follow DOE procedure in giving Reel an unsatisfactory rating

for the 2009-2010 school year.  The evaluation form includes

numerous performance categories at corresponding boxes in which

C53MREEC

to indicate whether a teacher's performance is satisfactory or

unsatisfactory, Profeta declaration, Exhibit 61.  Principal

Ortiz did not check off any of the boxes, Id.  At her

deposition, Ortiz testified that her failure to do so was an

"oversight" and that her "secretary forgot to do it," Ortiz

deposition at 191-92.  Although a "violation of an

organization's internal procedures alone is insufficient to

create an inference of discrimination, the failure to follow

internal procedures can be evidence of pretext." Petrovits v.

New York City Transit Authority, 2002 WL 338369, at *8

(S.D.N.Y. March 4, 2002).

        Viewing the evidence in the light most favorable to

Reel, a reasonable jury could conclude that retaliatory motive

played a part in DOE's decision to give Reel an unsatisfactory

rating.  Accordingly, DOE's motion for summary judgment on

Reel's Title VII and Title IX retaliation claims will be

denied.

        Turning to plaintiff's New York State Human Rights Law

and New York City Human Rights Law claims, DOE argues that

Reel's state and city law claims must be dismissed because she

failed to serve a notice of claim on DOE, as required by New

York Education Law Section 3813, citing defense brief at 24-25.

Reel counters "that this is incorrect.  Plaintiff served her

notice of claim dated May 6, 2008.  Both the filing and the

response to the notice of claim was pleaded in both the

C53MREEC

1  complaint at paragraph 51 and the amended complaint at

2  paragraph 63," citing plaintiff's opposition brief at 30.

3          The supposed notice of claim to which Reel refers is a

4  letter dated May 6, 2008 from Reel's counsel to Joel Klein,

5  then DOE chancellor, citing Parkhurst declaration, Exhibit 22.

6  The letter states as follows:  "To the extent that Section 3813

7  of the education law applies to any potential claims against

8  DOE, and to the extent prior complaints by Ms. Reel or other

9  faculty would not be considered a notice of claim to DOE, then

10 please consider this letter such a notice of claim," Id. at 2.

11         Section 3813(1) of the education law provides that no

12 action may be maintained against a school district unless a

13 written verified notice of claim was served on the "governing

14 body" of that school district within three months of the

15 accrual of that claim.  "The Court of Appeals has stated that

16 substantial compliance will not satisfy the notice provisions

17 of Section 3813(1).  The statutory prerequisite is not

18 satisfied by presentment to any other individual or body, and,

19 moreover, the statute permits no exception, regardless of

20 whether the Board had actual knowledge of the claim or failed

21 to demonstrate actual prejudice."  Professional Details

22 Services, Inc. v. Board of Education of City of New York, 104

23 A.D.2d 336 (1st Dep't 1984) (quoting Parochial v. Board of

24 Education, 60 N.Y.2d, 539, 548-49 (1983)).  New York courts

25 have ruled that service of a complaining letter on a

C53MREEC

1  superintendent of the schools does not constitute compliance

2  with the notice of claim requirement.   In <u>Spoleta Construction</u>

3  <u>& Development Corp. v. Board of Education</u>, 221 A.D.2d, 927 (4th

4  Dep't 1995), the court noted that "education law, Section

5  3813(1) requires a claimant to serve the notice of claim on the

6  governing body of the school district.   The governing body in

7  this instance is the board of education.   And plaintiff's

8  delivery of the letter to the superintendent of the schools

9  does not constitute service upon the board," <u>Id.</u> at 928.   <u>See</u>

10  <u>also</u> <u>Jackson v. Board of Education</u>, 194 A.D.2d, 901, 903 (3d

11  Dep't 1993) ("In this case, petitioner served the notice of

12  claim solely on the superintendent, who is not a member of the

13  governing body or the clerk of the governing body of

14  respondent.   Accordingly, Supreme Court did not err in

15  concluding that petitioner did not comply with the mandates of

16  Education Law Section 3813(1).")

17        Because Ms. Reel did not serve a notice of claim on

18  the Board of Education, as required by Section 3813(1), DOE is

19  entitled to summary judgment on her New York State Human Rights

20  Law and New York City Human Rights Law claims.

21        Accordingly, for the reasons I just stated, DOE's

22  motion for summary judgment will be granted.   As to plaintiff's

23  New York State Human Rights Law and New York City Human Rights

24  Law claims, they will otherwise be denied.

25        I want to discuss a trial date with you.   I can offer

C53MREEC

 1    you a trial date of July 9.

 2               MR. PARKHURST:  This coming July?

 3               THE COURT:  Yes.

 4               MR. PARKHURST:  Okay.  I would love that.  The only

 5    issue you may recall -- as plaintiff's counsel, I would love

 6    that.  The only issue you may recall was that while summary

 7    judgment papers were being served, we had agreed on a couple of

 8    things.  One, that Corporation Counsel would have the

 9    opportunity to depose Mary Kate Schweizer.  The second is we

10    also agreed that expert discovery would occur after the summary

11    judgment motion.  I would like to be able to check with my

12    expert and how quickly he could put together a report.

13               There are a lot of records to review here.

14    Ms. Schweizer, we were able to get a statement from her.  I can

15    contact her.  I can't say she is in my custody and control.  To

16    the extent we can do that as quickly as that, I would love

17    that, as plaintiff's counsel.  I am not sure, given the need

18    for expert discovery and the need to depose Ms. Schweizer, that

19    it can quite be done in that time.

20               THE COURT:  Why don't you take a week to reach out to

21    Ms. Schweizer, reach out to your expert.

22               Mr. Profeta, do you have an expert that you are using?

23               MR. PROFETA:  Your Honor, I hadn't contemplated that,

24    but I'll have to see what plaintiff is up to and then talk to

25    my people.

C53MREEC

1          THE COURT:  Mr. Parkhurst, you will make whatever

2     inquiries you deem necessary.  You will speak with Mr. Profeta

3     and then send me a letter in a week's time telling me what the

4     situation is and what time will be necessary to complete the

5     discovery that needs to be done; and with that in mind, what

6     counsel thinks is an appropriate trial date.

7          I will try the case as early as counsel can do it.

8     I'm not going to be an impediment to the case being tried.

9     It's a question of how long counsel need to get the remaining

10    discovery done and then scheduling it for trial.

11         MR. PARKHURST:  Thank you, your Honor.

12         MR. PROFETA:  Thank you, your Honor.

13                              o0o

14

15

16

17

18

19

20

21

22

23

24

25